Filed 9/29/22 S.S. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.S. et al., | |
| Petitioners, | |
| v. | G061529 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. Nos. 19DP0394A & 20DP0401A) |
| Respondent; | O P I N I O N |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petitions for writ of peremptory mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge. Petitions denied.

Martin Schwarz, Public Defender, Seth Bank, Assistant Public Defender, Brian Okamoto, Deputy Public Defender for Petitioner S.S.

Juvenile Defenders and Donna P. Chirco for Petitioner A.M.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Mari Duque for Real Parties in Interest Minors.

**INTRODUCTION**

Juvenile dependency cases are usually difficult, often tragic. But few are as horrific or as heartbreaking as this. Before us are two petitions for writ filed by the mother and father of two young girls, both under the age of five. The girls were detained after a domestic violence incident between the parents went horribly awry, resulting in the stabbing of the older child, then only two years old. The parents do not seek review of the juvenile court's ruling setting a permanency planning hearing to potentially terminate their parental rights to the girls. Rather, they seek review of the court's decision to deny father's brother, Armando, temporary custody of the girls pending the hearing. We deny both petitions and hold the trial court did not abuse its discretion in maintaining the children in their current placement.

**FACTS**

S.S. (Father) and A.M. (Mother), an unmarried couple, are the parents of two daughters, 3-year-old V. and 2-year-old D.[1] In the early morning hours of December 19, 2021, Father appeared at his mother's home in Costa Mesa with V. strapped into the passenger seat of the car without a car seat. The toddler had blood on her shirt, and

---

[1] Mother also has two older children – J.R. and U.S., by other fathers – who were removed from Mother's care at the same time as V. and D. Their cases are not a subject of the present writ petitions so we will only mention the older children to the extent their information is relevant to said petitions.

2

Father appeared panicked and distraught. He wanted someone to go with him to the hospital to seek care for her, but would not tell his family members what had happened to her. His relatives removed the child from the car and called an ambulance, and Father then drove off.

V. was taken to Children's Hospital of Orange County and an examination revealed she had suffered a penetrating stab wound to her right flank so severe that fatty tissue was protruding from the wound. In addition to the wound, V. had burn marks on both legs, multiple scars and abrasions, a swollen left hand, swelling on her scalp, and swollen bruises on her right foot. The letter "s" had been carved into her right foot. She also had a shaved head, a fever, and exhibited signs of malnourishment, including hair loss. Doctors performed a partial omentectomy and closed the wound.[2]

Police visited the family home where V. lived, and spoke to Mother, who denied Father was there. Father was then apprehended trying to depart through the back. Both parents were taken into custody and interviewed by detectives. They admitted they had been arguing and things had gotten physical. Initially, both came up with different stories as to what had happened to V. Mother said Father had taken an uninjured V. out of the apartment and later returned in a nervous state before the police showed up. Father said he had taken V. from the apartment after he and Mother had argued, and V. went with him in the car to another neighborhood where he planned to purchase methamphetamine from a known associate. He claimed an unknown gang member approached the car for no reason and stabbed V.

Both parents then told detectives their initial stories had not been true. They proceeded to describe the actual series of events, with a few contrasting details.

Mother and Father had been arguing, and Father attacked her and was choking her. He saw a kitchen-type knife on a table near the television and grabbed it as

---

[2] The omentum is a fold of fatty tissue that surrounds major abdominal organs such as the stomach and intestines. Since V.'s omentum was protruding, some of it had to be removed.

3

he was taking Mother to the ground. He held her down and swung the knife at her several times, and stabbed V. instead.[3] Both parents insisted V. was not purposefully stabbed.

Unfortunately, the stabbing was merely the latest episode in a disturbing pattern of abuse and neglect toward V. It had started even before her birth – Mother had an unresolved methamphetamine addiction, and V. tested positive for the substance as a newborn. V. and the two older children were removed from Mother's custody at that time. One year later, D. was born and removed from Mother's custody. The dependency was eventually terminated and the children reunified with Mother in the first half of 2021, but both parents seemed to be regressing to old behaviors.

Both Mother and Father continued to mistreat and neglect V. Father admitted to striking and taking his anger at Mother out on V. And Mother tolerated the physical abuse.

Witnesses told social workers that mother seemed to fixate on and target V. for mistreatment. Mother had been in a relationship with the man who fathered one of her older children until she became pregnant with V. by Father. The ex-boyfriend claimed Mother had told him she "did not love" V. and blamed V. for breaking up their relationship. Father's sister (the paternal aunt) noticed at a birthday party for D. and V. (whose birthdays both fall on the same day) that Mother castigated and sidelined V., even excluding her from family photos. At one point, V. almost fell down and the paternal aunt said Mother did nothing to help V. The aunt was very uncomfortable with the way V. was being treated by Mother. She also noticed marks and bruising on V. She did not alert authorities, though. U.S.' paternal grandmother even took it upon herself to

---

[3] The record contains conflicting details as to how the stabbing actually occurred. Mother said in her interview that she was being straddled on the ground and Father stabbed the carpet next to her several times and accidentally clipped V. as V. came into the room to ask for water. Father said V. was asleep on the couch under a brown blanket and he didn't know she was there. He said he stabbed the couch to try and scare Mother and realized he had stabbed V. by mistake. For our purposes, it is sufficient that both parents admit V. was stabbed by Father during an altercation with Mother.

question Mother about her differential treatment of V. She felt Mother may not have bonded well with V. since the child was removed at birth.

All four children were detained directly following V.'s stabbing, and a dependency petition was filed as to them on December 21, 2021. At the detention hearing, Father asked that his Mother and sisters be considered and assessed for placement. Both parents sought visitation, but the juvenile court denied the request given the egregious circumstances of the case. It set a jurisdictional hearing for early 2022, and ordered the Orange County Social Services Agency (SSA) to prepare a report by mid-January.

SSA's report was filed on January 14, 2022, and, not surprisingly, it recommended the dependency petition be sustained and the children declared dependents with no family reunification services offered to Mother or Father. It further recommended that "suitable placement[s]" be ordered with "consideration of placement to relatives."

In the report, SSA detailed how V. and D. had been placed with foster parents Joseph and Brittany P. two days after the stabbing, and their older half-siblings were placed with paternal family members. V. had been discharged from the hospital sometime around Christmas, and shortly before New Years' Day 2022, the social worker visited Joseph and Brittany's home to see how the children were doing. V. was exhibiting normal behavior, but she was physically quite weak. She could not walk upstairs by herself, could not hold a marker or pen, and moved slowly. She had low iron, and had a tendency to put things in her mouth, including dirt. She was particularly attached to Brittany, and was cautious around Joseph.

D. was moving and talking normally, but exhibited a few problematic behaviors. She would ask for additional food from Joseph even though she was already eating or had food in her hand. She appeared to have some separation anxiety, wanting to make sure Joseph and Brittany were at home and looking for them if she could not see

5

them. She was also adversarial with her sister, aggressively taking toys away from V. and throwing tantrums. The two girls would frequently argue and scream at each other. According to the Early Start Service Coordinator who assessed her, D. was experiencing delays in all areas of development.

Joseph and Brittany were beginning to work on these behaviors by teaching D. to use gentle hands and act with love toward her sister, and also to take deep breaths to calm herself down when she felt upset. Their guidance appeared to be having effect, because by January 4, Brittany said the girls had been able to share two toys the previous day and were starting to learn to play nicely together.

Both V. and D. were having problems sleeping upon their arrival at Joseph and Brittany's home. V. would breathe fast and talk incoherently in her sleep and would wake up during the night looking for her caregivers. D. would get night terrors and would resist going to sleep at bedtime. She gasped for air, and would wake up multiple times looking for Brittany or Joseph, who would have to rock her back to sleep each time.

On December 23, 2021, social workers interviewed Father's brother, Armando B., to assess him for potential placement of the girls. Armando and Father had not been close, and he claimed no knowledge of V.'s stabbing or of the abuse. He only found out about everything when he spoke to his sister, who told him V. was in the hospital. He wanted to take the girls in and adopt them if reunification was not possible.

Armando and Father did not see each other often, but Armando said he would often visit his sister and Mother on his days off. During these visits, he was told that both Mother and Father were using drugs. He saw it as their personal business and made nothing of it. Armando denied knowledge of any abuse, but he claimed to have heard family members discussing concerns over V.'s weight and Mother's mistreatment of her. He also saw the family in November 2020 and noticed the children were thin, and D. was dressed only in a diaper. Despite these signs, he did not feel it appropriate for him to intervene with his brother's family.

In its January 14 report, SSA registered clear reservations about Armando's ability to protect the children, given that he seemed to minimize Father's drug use, did not follow up or ask after V. or D.'s welfare after the interview,[4] and made inconsistent statements about his knowledge of what was going on.

When the jurisdictional hearing was finally held, after a few continuances, on March 14, 2022, it was fairly clear cut. Both Mother and Father submitted on the petition. The juvenile court found the allegations in it true and the children were declared dependents.

Next came a contested disposition hearing, which finally went forward on May 12, and continued until the end of June. The social worker, Beverly Martinez, testified that out of the girls' paternal relatives, only Armando was willing to be assessed for placement. The other family members did not wish to be considered. While Armando was cooperative in the assessment process, and his home was up to scratch, Ms. Martinez said she did not recommend placement with him because he failed to protect the children. He knew that V. was being mistreated but did not act because he did not want to get involved.

After hearing testimony from several other witnesses, including Armando and the foster parents, the court bypassed reunification services for Mother and Father, and set a permanency planning hearing under Welfare and Institutions Code[5] section 366.26 for October 24, 2022. Following SSA's recommendation, the court declined to place the children with Armando, finding it would not be in the children's best interest.

---

[4] In court, Armando disputed this characterization. He claimed he consistently asked after the girls and requested visitation, but was told he needed to finish parenting classes before he could see them. After he finished the classes, he said he still could not get cleared for visitation. Ernesto Vasquez, the social worker tasked with assessing Armando's home for potential placement, testified he told the caseworker, Beverly Martinez, about Armando's desire to see the girls.

[5] All further statutory references are to the Welfare and Institutions Code.

**DISCUSSION**

Both Mother and Father took up timely petitions for writ under California Rules of Court, rules 8.450 through 8.452 in order to challenge the court's decision as to placement.[6] It is appropriate for us to review this ruling via writ. (See *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247 ["All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ."].)

Mother and Father claim SSA and the juvenile court failed to adequately consider Armando for placement pursuant to the relative placement preference under section 361.3. We review placement rulings for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*).) Here we find none.

"Juvenile dependency laws are meant 'to preserve and strengthen the minor's family ties whenever possible.' (§ 202, subd. (a).) Accordingly, when a child is adjudged a dependent of the court and removed from the parents' physical custody, 'preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . .' (§ 361.3, subd. (a).) '"Preferential consideration" means that the relative seeking placement shall be the first placement to be considered and investigated.' (§ 361.3, subd. (c)(1).) The statute does 'not supply an evidentiary presumption that placement with a relative is in the child's best interests' but it does require the social services agency and juvenile court to determine whether such a placement is appropriate, taking into account multiple factors including the best interest of the child, the parents' wishes, and the fitness of the relative[]. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320; see *id.* at pp. 321-322.) 'The correct application of the relative placement preference places the relative "at the head of the line when the court is determining which placement is in the child's best interests." [Citation.]' (*Cesar V. v.*

---

[6] Armando timely filed a notice of intent to file writ petition, but ultimately did not file one.

8

*Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)" (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295-1296.)

First, we note the above rationale seems less compelling in the present context. "The object of dispositional hearings is to find a temporary caretaker who will meet the child's physical and psychological needs while cooperating in reunification efforts. A relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child. [¶] However, once the juvenile court determines at a permanency planning hearing that reunification is no longer possible and that a child should be freed for adoption, there is no longer any reason to give relatives preferential consideration in placement. The overriding concern at this point is to provide a stable, permanent home in which a child can develop a lasting emotional attachment to his or her caretakers. It is for this reason that in any subsequent decision on adoptive placement, a foster parent to whom the minor already has 'substantial emotional ties' necessarily is entitled to preference over all other candidates. (§ 366.25, subd. (g).)" (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1493-1494.)

The permanency planning hearing is yet to come, but the prospect of reunification in this case has always been dismal, if not completely nonexistent.[7] Mother and Father have been incarcerated since the time of the girls' detention; they are facing criminal charges related to their treatment of V. which could result in life sentences. The juvenile court has never allowed them visitation. SSA has not even *spoken* with them due to a global invocation of their Fifth Amendment rights against self-incrimination. And moreover, the juvenile court has bypassed such services. If reunification efforts are dead on arrival, as they seem to be here, the preference under section 361.3, subdivision (a) carries a little less heft than it otherwise might. (See *Robert L.*, *supra*, 21 Cal.App.4th

---

[7] While the juvenile court said reunification services were not "foreclosed," it said the prospect for services was "narrower . . . than if the court had ordered reunification services" at the disposition hearing.

9

at p. 1064 [noting relative preference is appropriate "even after disposition, so long as reunification efforts are ongoing."].)

But let's assume the preference applies nevertheless. Under section 361.3, subdivision (a), "the county social worker and court shall consider" a number of factors "[i]n determining whether placement with a relative is appropriate[.]" Those factors include "[t]he wishes of the parent, [and] the relative;" "[t]he nature and duration of the relationship between the child and relative, and the relative's desire to" provide the child with legal permanency; and the ability of the relative to "[p]rotect the child from his or her parents." (*Ibid.*) They also include "the ability of the relative to provide a 'secure and stable environment' for the child" and the "ability of the relative to exercise proper care of the child, to provide an adequate home, and to facilitate reunification with the child's parents. However, the 'best interests of the child' is the linchpin of the analysis." (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1068.)

Here, both Ms. Martinez and the juvenile court considered these factors in determining that placement with Armando was not in the girls' best interests.

True, Armando wanted to provide legal permanency for D. and V., partly because they were his nieces but also because he and his wife had "always wanted to have a baby girl, but . . . didn't." The court recognized the earnestness of his desire in this regard. However, it noted both V. and D. had suffered serious and repetitive trauma at tender ages, and would "require a great deal of focus and effort to move [them] through therapeutic processes, to address the trauma, and to provide the type of rehabilitated services that are going to allow them to mature in a healthy fashion." Despite the purity of his best intentions, Armando was not grasping the depth of the girls' needs. For the juvenile court, the risk was too great, remarking that at this "crucial state of these children's development they cannot afford anything but the very best attention to their needs. And time, in coming to terms with their needs, is time with [*sic*] these children cannot afford."

10

Some of the other statutory factors weighed against Armando as well. He had no existing relationship with the girls. Before the dependency, he had only seen them once due to the pandemic. The first time he met them was around June 2021, when they stopped by the Lazy Dog Café, where he worked, to have some food. The juvenile court found it troubling that he did not follow up with his brother after their visit to the restaurant to see how they were doing, or if they were okay; especially given the fact that the family had become aware of potential abuse or neglect issues in the household.

V. and D. both required speech therapy and counseling, and V.'s educational needs needed to be assessed by her school district. Brittany and Joseph were doing fine as caregivers, and they wanted to adopt the girls. Indeed, the girls were thriving with them. They had made huge strides in their development and behavior since being placed with Brittany and Joseph. The trial court appears to have properly undertaken the analysis required under section 361.3, subdivision (a) and conducted a sober and careful assessment. We cannot find a reason to disturb it.

## DISPOSITION

The petitions for extraordinary writ are denied.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

11